## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| WILLIAM SPALKE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 16-10856-TSH** |
| NANCY BERRYHILL,[1] | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

### September 5, 2017

Hennessy, M.J.

The Plaintiff, William Spalke, seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying him Supplemental Security Income ("SSI"), or, in the alternative, remand to the Administrative Law Judge ("ALJ").[2] (Docket #15). The Commissioner seeks an order affirming the decision. (Docket #16). By Order of Reference dated December 21, 2016, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket #22), this matter was referred to me for a report and recommendation on these two motions.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy Berryhill is substituted for Carolyn W. Colvin, as the Acting Commissioner of the Social Security Administration as of January 23, 2017.

[2] In his motion, Spalke states that he filed an application for disability insurance benefits (Docket #15 at 1); however, the record shows that Spalke's application was in fact for SSI. (Tr. 99).

For the reasons that follow, I hereby RECOMMEND that Spalke's Motion to Remand (Docket #15) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #16) be ALLOWED.

I.    BACKGROUND

A.    Procedural History

Spalke filed an application for SSI on July 20, 2012, alleging disability as of that date. (Tr. 99). The application was denied initially and upon reconsideration. (Tr. 99, 119). Spalke requested a hearing on October 31, 2013, which was held before an ALJ on September 17, 2014. (Tr. 33-84, 130-32). On December 3, 2014, the ALJ issued a decision finding Spalke was not disabled. (Tr. 9-32).

On March 14, 2016, the Appeals Council denied Spalke's request for administrative review, rendering the ALJ's decision final and ripe for judicial review. (Tr. 1-6). Having timely pursued and exhausted his administrative remedies before the Commissioner, Spalke filed a complaint in this Court on May 10, 2016, pursuant to 42 U.S.C. § 405(g). (Docket #1). Spalke filed the motion for reversal or remand on September 22, 2016, (Docket #15), and the Commissioner filed a cross-motion on November 3, 2016, (Docket #16). On December 19, 2016, Spalke filed a response to the Commissioner's motion, (Docket #20), and on December 27, 2016, the Commissioner filed a sur-reply, (Docket #25).

B.    Personal History

At the time he claims he became disabled, Spalke was 50 years old. (Tr. 198). Spalke holds an Associate's Degree in Paralegal Studies. (Tr. 39, 203). He is single and has never been married. (Tr. 38-39). Since 2011, he has alternated between being homeless and living in shelters.

(Tr. 38). Spalke does not have a driver's license. (Tr. 220). He has been arrested and jailed several times since 2007. (Tr. 250).

Spalke previously worked as a paralegal, a receptionist at a construction firm, and as a kitchen staff member. (Tr. 40-41, 209). In his Adult Disability Report, Spalke stated he worked as a paralegal from January 2004 to January 2007, earning $375.00 per week. (Tr. 203). On the same form, Spalke indicated he next worked for Two Brother's Construction from January 2009 to January 2011, earning $250.00 per week. (Id.). At his hearing, Spalke testified that he worked as kitchen staff at the Boston Public Health Commission kitchen for the homeless for two months in 2012. (Tr. 40).

C.    Medical Evidence

On May 25, 2012, while residing in a transitional housing program, Spalke presented at the Boston Health Care for the Homeless Program ("BHCHP") complaining of umbilical hernia pain that he traced to January 2012. (Tr. 409-12). He was given pain medication, advised on when to seek immediate medical care, and a follow up appointment was scheduled. (Id.). On May 31, 2012, Spalke received a referral to surgery for his umbilical hernia from Dr. Gabriel Wishik. (Tr. 408). During this visit with Dr. Wishik, Spalke denied depression, anxiety, memory loss and suicidal ideation. (Tr. 407).

Spalke again presented at BHCHP on June 5, 2012 complaining of chronic back pain and facial pain for which he received Motrin. (Tr. 403-04).

During a July 9, 2012 appointment at BHCHP, Spalke complained of anxiety and borderline depression. (Tr. 385-88). The medical record notes Spalke has a history of abuse of substances, including alcohol, heroin, and cocaine. (Tr. 385-86). The report also details Spalke's

social history, indicating he was recently incarcerated, that he had been homeless since March 2012, but that he had not been homeless previously. (Tr. 386).

On July 19, 2012, Spalke presented at Boston Medical Center for a surgical consult regarding his umbilical hernia. (Tr. 329). Dr. Brian Carmine examined Spalke and recommended an open hernia repair with mesh. (Id.).

Spalke alleges disability as of July 20, 2012. (Tr. 181-89).

Spalke established primary care with Dr. Wishik of the BHCHP on July 30, 2012 and reported to him with disability paperwork. (Tr. 379-80). During the visit, Spalke reported that he could not lift more than ten to fifteen pounds without pain, could not sit in one position or stand for more than twenty minutes, and could not walk more than one to two blocks without stopping. (Tr. 379). Dr. Wishik noted that Spalke had chronic back pain dating to a construction accident in 1986 for which he had a discectomy performed in 1996, used prescription and other drugs for pain management, was hearing impaired in his right ear, and was scheduled for an upcoming hernia repair. (Tr. 380).

On August 7, 2012, Spalke presented to the BHCHP for medical intake for Project SOAR, a transitional housing program, and was advised that he was medically stable to work until his hernia surgery. (Tr. 529-31). Spalke had moved to Project SOAR on August 2, 2012 from the Wyman Community Reentry Program. (Id.).

On August 22, 2012, Dr. Carmine successfully performed Spalke's umbilical hernia repair. (Tr. 365). Spalke returned to see Dr. Carmine for a follow-up visit on September 6, 2012 and Dr. Carmine reported Spalke was "doing well" despite fatigue and feeling some pain at the surgical site. (Tr. 332). Dr. Carmine advised Spalke to follow up as needed. (Id.).

Spalke met with Dr. Wishik again on October 1, 2012. (Tr. 469). Spalke requested to be cleared to work for Project SOAR, his transitional housing placement. (Tr. 469). Dr. Wishik's notes state that Spalke "may start going back to work now" but cautioned him against lifting more than fifty pounds for the next few weeks. (Tr. 472).

Later in October, during a follow up mental health examination at the BHCHP, Spalke admitted to "picking up beer" and complained of cravings. (Tr. 466). He also indicated he was looking for work. (Id.). The medical record states that Spalke had noted "some mood liability, but no concomitent [sic] neuroveg [sic] symptoms to suggest a mood/anxiety disorder." (Tr. 467). Spalke was not prescribed medication, but he was advised to follow up in six weeks before completing the re-entry program. (Id.). On October 27, 2012, Spalke slipped on wet grass. (Tr. 784). He was admitted to the hospital for observation for severe back pain, provided with medication, and deemed stable for discharge the next day. (Tr. 784-87).

On December 3, 2012, Spalke presented to the BHCHP complaining of new shoulder pain and chronic lower back pain and discomfort following a slip and fall.[3] (Tr. 455-56). Dr. Wishik counseled Spalke to use hot and cold applications, take ibuprofen, and to rest, though Spalke indicated he may not be able to do so because he needed to work in a kitchen and lift heavy things. (Tr. 457.) Dr. Wishik noted that Spalke was disappointed not to receive oxycodone for his back pain. (Id.). On December 31, 2012, Spalke returned to see Dr. Wishik for a follow up appointment. Spalke reported he was working in a kitchen and having trouble bending over and getting up. (Tr. 451). Spalke received tramadol for his symptoms. (Id.).

Spalke returned to the BHCHP on January 9, 2013 for an appointment to "transition for alcohol and drug counseling." (Tr. 444-48). During the visit, Spalke reported a relapse with

---

[3] The record does not explicitly tie this reported slip and fall to the one Spalke incurred at the end of October 2012.

cocaine and heroin. (Tr. 447). Spalke indicated he wanted to move forward with counseling and was advised to keep up his participation in group meetings. (Tr. 447-48).

On December 9, 2013, Spalke presented at the emergency department complaining of back pain after he slipped on ice and fell on his porch. (Tr. 758). Spalke had walked to the hospital and planned to walk home and was "repeatedly asking for pain medications." (Tr. 759). X-rays performed of the cervical and thoracic spine, hips, and pelvis showed no acute abnormalities but did reveal "some degenerative changes in the hip/pelvis." (Id.). After agreeing to follow up with his primary care provider, Spalke was discharged with a prescription for Ultram. (Id.).

On January 25, 2014, Spalke was admitted to the hospital with suicidal ideation and a plan to commit suicide. (Tr. 553). He reported he relapsed on alcohol and drugs the day prior as a result of increased anxiety related to his housing situation. (Id.). Upon admission, Spalke was deemed to have a Global Assessment of Function ("GAF") score of 35.[4] (Tr. 556). Early in his inpatient stay, Spalke reported back and hip pain and he endorsed depression and hopelessness. (Tr. 566, 584). Spalke responded positively to treatment, including therapy, relapse prevention and medication management. (Tr. 593-94, 597-98, 600, 604, 612). He was discharged to a shelter on January 31, 2014 and referred to counseling and a partial hospitalization program. (Tr. 615). His discharge note referenced "modest low back pain" while describing Spalke as "future oriented" and "upbeat." (Tr. 614-15). The note included a diagnosis of depression NOS, rule out depression

---

[4] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000). A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work). (Id.).

secondary to substance use, rule out depression secondary to medical condition, and anxiety NOS with a GAF score of 65.[5]  (Tr. 615).

In February 2014, Spalke commenced and completed the partial hospitalization program to which he was referred.  (Tr. 663).  During the course of that program, Spalke presented to the hospital following a motor vehicle accident complaining of low back pain and right knee pain. (Tr. 805).  Imaging conducted in the Emergency Department showed bilateral hip osteoarthritis but no acute fracture.  (Tr. 810).  Spalke's thoracic, cervical and lumbar x-rays revealed extensive degenerative changes, including "multilevel disk space loss which is moderate to severe in the lower cervical spine" but no fractures.  (Tr. 740-44).

On April 28, 2014, Spalke presented to the Edward M. Kennedy Community Health Center reportedly to get disability paperwork completed. (Tr. 672-73).  The center indicated the disability paperwork would be processed once it obtained medical records from Spalke's previous primary care provider.  (Id.).  Spalke returned to the center the next month complaining of worsening back pain that was aggravated by ascending stairs, bending, changing positions, daily activities, standing, and walking.  (Tr. 670).  Examination revealed a normal gait and no paraspinal muscle stiffness.  (Tr. 671).  He was advised of ongoing treatment methods but denied pain medication given his past history of abuse.  (Id.).

On May 17, 2014, Spalke was brought to the hospital after his friends notified the police that he was making suicidal threats.  (Tr. 722).  At the hospital, Spalke admitted to alcohol abuse, heroin use, and cocaine use but denied other medical complaints.  (Id.).  He underwent a psychiatric evaluation and was deemed to not be of risk for self-harm and discharged with instructions for outpatient follow up.  (Tr. 723).

---

[5] A GAF score of 61-70 indicates some mild symptoms or some difficulty in social or occupational functioning. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000).

On May 27, 2014, Spalke presented to a community counseling facility for an initial assessment. (Tr. 677). During intake, Spalke had a "flat affect and was somewhat withdrawn" and he presented with "PTSD symptoms . . . Major Depression with Psychotic features, and Polysubstance dependence." (Tr. 687). Spalke agreed to participate in a detoxification program. (Id.).

On July 9, 2014, Spalke presented at the hospital complaining of hip pain following a fall. (Tr. 707). It was noted that Spalke was able to "ambulate with some difficulty." (Tr. 710). The impressions from imaging note no evidence of fracture, moderately severe arthritic changes at the left hip, mild arthritic changes at the right hip, and disc narrowing of the lumbar spine. (Tr. 708-09). Spalke was discharged with pain medication on July 10, 2014. (Tr. 711). To reduce weight-bearing on the left hip, Spalke was also given crutches which he was directed to use until follow-up or his symptoms improved. (Id.).

Spalke returned to the hospital on August 2, 2014 complaining of low back pain after falling on the stairs at home. (Tr. 699). Following a lumbar spine x-ray that revealed no acute findings, Spalke was discharged with pain medication and instructions to follow up with his primary care physician. (Tr. 701-02). There is no indication that Spalke was using crutches at this time and in fact indicated that he was running when he fell. (Id.).

On August 17, 2014, Spalke presented at the emergency room complaining of depression and suicidal ideation with a reported plan to overdose. (Tr. 816). Spalke arrived ambulatory and was observed to have a steady gait. (Tr. 818). Spalke reported his depression had been significantly worse for the last few months, stating that his thoughts were always down and that he suffered poor sleep due to back pain. (Tr. 816). Spalke also referenced his upcoming disability hearing, noting that "this time he has a lawyer" and expressed concern about obtaining copies of

his medical records for the judge. (Id.). Examination revealed full orientation, clear speech, linear thought process, fair insight and judgment, grossly intact memory, and restricted affect. (Tr. 817). Spalke was admitted and, with treatment, he reported that his mood and racing thoughts improved, and that he slept better. (Tr. 817). Spalke was discharged on August 21, 2014 with a diagnosis of bipolar disorder; posttraumatic stress disorder; anxiety disorder, not otherwise specified, rule out social anxiety; and reported history of back pain and hip pain. (Tr. 816-17).

D.    Medical Opinions

   1. Primary Care

   On July 31, 2012, Dr. Wishik – Spalke's primary care provider – completed Spalke's forms for the Massachusetts Emergency Aid to the Elderly, Disabled, and Children (EAEDC) Program. (Tr. 303-12). Dr. Wishik referenced Spalke's chronic back pain, hearing loss and umbilical hernia and indicated the former two were expected to last more than a year. (Tr. 308). Dr. Wishik stated Spalke had difficulty lifting more than ten pounds and that he could not sit or stand in one position for longer than a few minutes or walk more than a block without pausing. (Tr. 311). Dr. Wishik concluded by stating that Spalke would "benefit from any assistance that he is eligible for." (Id.).[6]

   On July 25, 2013, Dr. Wishik completed two forms at the behest of the Social Security Administration detailing Spalke's disc disease and pain. (Tr. 532-33). Dr. Wishik noted that Spalke had a "limited ability to bend forward and get back up," that he "cannot stand/sit for much time [without] pain," and that he "cannot bend at the waist [without] pain." (Id.).

   2. State Agency: Physical

   On September 19, 2012, Dr. Mary Connelly of the Disability Determination Service reviewed the record and opined Spalke could: lift twenty pounds occasionally and ten pounds

---

[6] Later, in November 2012, the Massachusetts Department of Transitional Assistance informed Spalke that it determined he was disabled for purposes of the EAEDC Program. (Tr. 719).

frequently; sit for about six hours of an eight-hour workday; stand and/or walk for about six hours of an eight-hour workday; and occasionally stoop, kneel, crouch or crawl. (Tr. 92-93). On October 31, 2012, State agency consultant Dr. Michelle Holmes confirmed the same restrictions, adding that Spalke should be able to change position every hour for five minutes to reduce discomfort, and that he could occasionally climb ramps/stairs, climb ladders/ropes/scaffolds or balance. (Tr. 94-95). Dr. Holmes also indicated that Spalke would have difficulty with phone work and dealing with the public. (Tr. 95). On reconsideration, State agency consultant Dr. Robin Tapper reached the same conclusions as Dr. Holmes. (Tr. 113-14).

On October 9, 2012, Spalke met with Dr. Asha Saxena for a disability evaluation services examination. Dr. Saxena noted Spalke's lower back pain, his loss of hearing, and his recently repaired umbilical hernia. (Tr. 369-71). After detailing Spalke's alcohol and drug use, Dr. Saxena wrote that Spalke claimed to have been sober for the past 195 days. (Tr. 370). Dr. Saxena also noted that Spalke can walk for a block, climb one flight of stairs, carry fifteen pounds with minimal discomfort, and that he is "able to perform his [Activities of Daily Living] normally." (Tr. 371). However, the report indicates Spalke stated he could not sit, stand or walk for more than thirty minutes. (Id.).

3. State Agency: Mental

On December 31, 2012, Cornelius Neil Kiley, Ph.D., an advising psychologist to the Disability Determination Service, assessed that Spalke had mild restrictions in activities of daily living, moderate difficulties in maintaining social function, and moderate difficulties of concentration, persistence, or pace. (Tr. 91-92). In rating Spalke's sustained concentration and persistence, Dr. Kiley noted that Spalke was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal

workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 96). In sum, Dr. Kiley explained that Spalke "remains able to focus on and complete simple, work related tasks." (Id.). As for Spalke's social interaction limitations, Dr. Kiley found his ability to interact appropriately with the general public was moderately limited, noting that Spalke nonetheless "remains able to manage simple social demands." (Id.). Later, on reconsideration, Judith Kellmer, Ph.D. added that Spalke's ability to accept instructions and respond appropriately to criticism from supervisors was moderately limited, but she otherwise affirmed Dr. Kiley's findings. (Tr. 114-15). Echoing Dr. Kiley, Dr. Kellmer concluded that Spalke "remains able to focus on and complete simple, work related tasks" and that he "remains able to manage simple social demands." (Tr. 115-16).

On November 5, 2012, Spalke met with Scott Haas, Ph.D. for a disability evaluation services examination. (Tr. 372). During the evaluation, Spalke reported problems with concentration, anxiety, and symptoms associated with depression. (Tr. 372-73). He also described his drug and alcohol use, again reporting that he had been sober for the past 195 days. (Tr. 374). Spalke stated he felt he could not work because he is troubled and ill at ease with himself and others around him. (Id.). Dr. Haas opined that Spalke was "capable of comprehending information, learning tasks of varying complexity, [and] learning new tasks with ordinary training." (Tr. 375). Dr. Hass noted Spalke "does not need supervision to perform activities of daily living," and that he presented "with adequate social judgment" and "seems capable . . . of interacting with the general public . . . ." (Id.).

On August 15, 2013, Spalke met with Dr. Michael Bohnert for a psychiatric consultative examination for Disability Determination Services. (Tr. 293). Spalke detailed his work history,

medical problems, alcohol and drug use, and noted he was diagnosed with posttraumatic stress disorder after September 11, 2001. (Tr. 293-96). With respect to Spalke's substance use, Dr. Bohnert reported that Spalke said he was currently drinking a six-pack of beer and a half a pint of hard liquor two or three days each week. (Tr. 294). Spalke indicated that he walked locally where he needs to go or takes public transportation for longer distances. (Tr. 293). Spalke reported few hobbies or interests, but that he was able to watch television, prepare meals, shop for groceries, shower, do his own laundry, and clean when necessary. (Tr. 295-96). Dr. Bohnert diagnosed Spalke with: depressive disorder NOS, moderately severe; alcohol abuse and probable history of alcohol dependence with a current pattern of abuse; and a history suggestive of chronic posttraumatic stress disorder, moderate. (Tr. 296-97). Dr. Bohnert assessed a GAF score range of 54-58.[7] (Tr. 297).

E.      Hearing Testimony

A hearing before an ALJ was held on September 17, 2014, where Spalke, represented by an attorney, and a vocational expert, testified. (Tr. 33-84).

Spalke testified that he received state assistance and that he has an Associate's Degree in Paralegal studies. (Tr. 39). Spalke said he had alternated between homelessness and living in shelters since 2011. (Tr. 38). He stated he was last jailed in 2011. (Tr. 55).

Regarding his physical impairments, Spalke testified that back and hip pain prevented him from working. (Tr. 41). He said he could stand in one position for periods of ten to fifteen minutes and sit for periods of fifteen to twenty minutes. (Tr. 59-60). Spalke indicated he could lift ten to fifteen pounds. (Tr. 61).

---

[7] A GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty of social or occupational functioning. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000).

With respect to mental impairments, Spalke noted depression and posttraumatic stress disorder (Tr. 43), suicidal thoughts (Tr. 51, 66), anxiety (Tr. 66), and difficulty concentrating (Tr. 67, 73).

Spalke testified that he does not drive, but if he did he could do so for fifteen to twenty minutes. (Tr. 61). He wakes between 5:00 a.m. and 9:00 a.m. in the morning, attends doctor's appointments, bathes, can do laundry, watches TV, and goes to the library and park. (Tr. 62-65).

Spalke also described his history of substance abuse, including his use of alcohol, cocaine and heroin. (Tr. 44). He claimed the last time he was drunk was July 4, 2014, two months prior, but that he had consumed alcohol as recently as thirty days before the hearing. (Tr. 45-46). Spalke said that he last used drugs on February 15, 2014 but later admitted he may have used in May 2014, around his birthday.[8] (Tr. 45, 51). Spalke acknowledged his struggle with addiction and indicated he looked forward to sobriety. (Tr. 53-54).

Spalke also testified to his employment history, including working in a kitchen, as an office manager at a construction company, and as a paralegal. (Tr. 40, 77). Most recently, Spalke said he worked in the kitchen at the Boston Public Health Commission but was let go after two months because of his back. (Tr. 40). Previously, he worked at Two Brother's Construction answering the phone, faxing, and filing papers, though he said he struggled to perform the latter function and lost or incorrectly filed papers. (Tr. 40, 75). He testified that he held this position for just eight months.[9] (Tr. 40). Spalke explained that his work at Two Brother's afforded him the flexibility to lay down on the floor, as needed. (Tr. 75). He stated he stopped working there because the firm

---

[8] The medical record indicates that on May 17, 2014, Spalke admitted to alcohol, heroin, and cocaine use. (Tr. 722).

[9] In his Adult Disability Report, Spalke indicated he worked for Two Brother's from January 2009 to January 2011. (Tr. 203).

"went under" but testified that his pain and depression would preclude him from returning even if it were still in business. (Tr. 40-41). He also cited prior work as a paralegal. (Tr. 77).

Following Spalke's testimony, the ALJ asked a vocational expert for his assessment on the skill and exertional levels of Spalke's work history. (Tr. 77-78). The vocational expert explained the paralegal job was skilled work with a Specific Vocational Preparation ("SVP") of seven and light exertion.[10] (Tr. 78). The Two Brother's work, described as a receptionist position, was semiskilled work with an SVP of three and light exertion. (Id.). The vocational expert testified that there would be "some transferable skills from the paralegal work in particular." (Id.).

The ALJ then asked the vocational expert to consider the following hypothetical:

[A] male Claimant, 52 years of age, left-hand dominant. He has a High School Degree and an Associate's Degree in Paralegal [sic]. He has past relevant work at the light exertional level at the semiskilled and skilled level and has transferrable skills as indicated in your testimony. I'd like you to assume that because of his combination of exertional and nonexertional limitations, his residual functional capacity has been reduced to the light and sedentary ranges of work as those terms are defined in the Social Security Regulations. He is further limited in the light sedentary range of working at any job [INAUDIBLE] opportunity to all day sitting and standing in the workplace approximately maybe 20 minutes or so. He can lift approximately 15 pounds. He would have the ability to do routine repetitive tasks on work functions and work up to including semiskilled. With those assumptions in place, would there be any occupations existing in significant numbers in the national economy that the Claimant is vocationally qualified to perform based on his age, education, training and past relevant work?

(Tr. 78-79). The vocational expert responded that Spalke could perform past relevant work as a receptionist. (Tr. 79-80). The vocational expert said the work could be done "as performed," noting "I wouldn't see any reason why there wouldn't be a sit/stand option" or "a steady stream of calls that would, you know, keep him . . . [i]n his chair." (Id.).

---

[10] The term "Specific Vocational Preparation" is "defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles app. C (U.S. Dep't of Labor, 4th ed. Rev. 1991).

As for other work, the vocational expert responded that "at the sedentary level" the hypothetical individual could work as a surveillance system monitor consisting of 1,650 jobs in Massachusetts and 96,260 nationally, a telephone solicitor consisting of 3,640 jobs in Massachusetts and 231,900 nationally, and a document preparer consisting of 60,530 jobs in Massachusetts and 2,832,010 nationally. (Tr. 80-81).

The vocational expert also testified that if the hypothetical individual were not able to regularly interact over the phone or with the public then he would be unable to perform past relevant work as a receptionist or other work as a telephone solicitor, but that the surveillance system monitor and document preparer positions would still be viable. (Tr. 81). In another change to the hypothetical, the vocational expert stated that the latter two jobs would still be available if the individual could not lift more than 10 pounds occasionally or frequently, sit or stand for more than 20 minutes at a time, could not stoop, was limited to simple work, and could assume other postures occasionally. (Tr. 82). Were the hypothetical individual to be absent due to depression two or more times a month, the vocational expert testified that would compromise all competitive employment. (Tr. 83).

F.    Administrative Decision

In assessing Spalke's request for benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled to benefits. See 20 C.F.R. § 416.920; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

First, the ALJ considers the claimant's work activity and determines whether he is "doing substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i). If the claimant is doing substantial gainful activity, the ALJ will find that he is not disabled. Id. The ALJ found that Spalke had not engaged in substantial gainful activity since July 20, 2012, the alleged onset date. (Tr. 14).

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. § 416.920(a)(4)(ii). The ALJ determined that Spalke had the following severe impairments: degenerative disc disease of the lumbar and cervical spine; mood disorder NOS; posttraumatic stress disorder; and history of polysubstance abuse disorder in variable remission. (Tr. 14).

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the Social Security Regulations. 20 C.F.R. § 416.920(a)(4)(iii). If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled. Id. The ALJ found that Spalke did not have an impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1 impairment. (Tr. 14).

At the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). Whenever there is a determination that the claimant has a significant impairment, but not an "Appendix 1 impairment," the ALJ must determine the claimant's RFC. 20 C.F.R. § 416.920(e). An individual's RFC is his ability to do physical and mental work activities on a sustained basis, despite limitations from his impairments. 20 C.F.R. § 416.945(a)(1). The ALJ determined that:

> [Spalke] has the residual functional capacity to perform light work[12] as defined in 20 C.F.R. § 416.967(b) except that [he] could lift up to fifteen pounds. [He] would

---

[12] "Light" work:

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there

require the opportunity to alternate between sitting and standing every twenty minutes. [He] could perform routine, repetitive tasks. [He] could perform the normal work functions of work up to and including semi-skilled work.

(Tr. 16). The ALJ determined that Spalke was capable of performing past relevant work as a receptionist. (Tr. 25). Accordingly, the ALJ found that Spalke was not disabled.

In the alternative, the ALJ also assessed Spalke at the fifth step. At this step, the ALJ asks whether the claimant's impairments prevent him from performing other work found in the national economy. 20 C.F.R. § 416.945(a)(4)(v). The ALJ determined that, based upon the RFC and the testimony of the vocational expert, jobs exist in significant numbers in the national economy that Spalke can perform. (Tr. 26). Accordingly, the ALJ found that Spalke was not disabled, as defined in the Social Security Act, at any time from July 20, 2012, through December 3, 2014. (Tr. 26).

II.    STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991). The quantum of

_____

are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).

proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence. Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003). Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that he is disabled within the meaning of the Social Security Act. Bowen v. Yuckert, 482 U.S. 137, 146 (1987). The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process. Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982). This includes the burden of establishing his RFC. 20 C.F.R. § 416.912(a). At step five, the Commissioner has the burden of identifying specific jobs in the national economy that the plaintiff can perform. Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

III.     ANALYSIS

Spalke raises three primary objections to the ALJ's decision. He contends that: (1) the ALJ's RFC was erroneous; (2) the ALJ's finding at step four of the sequential evaluation process, that Spalke could perform past relevant work as a receptionist, was flawed, and; (3) the ALJ's step five finding of jobs Spalke could perform in the national economy was improper. (Docket #15 at 3-16). Each will be addressed in turn.

A.     The ALJ's RFC Finding

Spalke contends that the ALJ's RFC finding was erroneous, arguing that, as written, it limits him to sedentary work rather than light work, it failed to reflect his mental health limitations, and it was based on the opinions of medical experts that did not take his complete medical record into account. (Docket #15 at 4-11).

1.     Sedentary Work

The Social Security regulations define light work as "involv[ing] lifting no more than 20 pounds at a time[.]"  20 C.F.R. 416.967(b).  "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  Id.  In addition to lifting no more than twenty pounds, "[t]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983 WL 31251 (Jan. 1, 1983).  Spalke argues that he is precluded him from doing light work, and, instead, is limited to performing a reduced range of sedentary work[15] because the ALJ's RFC limited him to lifting only fifteen pounds and also included a sit/stand option, which he interprets to require four hours of standing and four hours of sitting each workday.[16]  (Docket #15 at 4-5).

While Spalke's ability to lift no more than fifteen pounds and to stand or walk for four hours falls short of the lifting capacity of twenty pounds and approximately six hours of standing or walking noted in the regulations and rulings, "these guidelines contain only 'the maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings.'"  Johnson v. Astrue, No. 10-30169-KPN, 2011 WL

---

[15] "Sedentary" work:

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

[16] The ALJ's RFC provided that Spalke "would require the opportunity to alternate between sitting and standing every twenty minutes."  (Tr. 16).  Spalke argues that this option, because it does not include a durational provision as to the specific intervals during which Spalke may change positions, must be assumed to commit him to alternating between sitting and standing every twenty minutes, adding up to four hours of standing and four hours of sitting each workday. (Docket #15 at 4).

5520379, at *6 (D. Mass. Nov. 9, 2011) (quoting SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)). Where a claimant is not capable of performing the full range of a category of work, a vocational expert should be consulted to clarify the implications of the claimant's RFC for the occupational base. See SSR 83-12, 1983 WL 31253 (Jan. 1, 1983) ("In situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere 'in the middle' in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability. Accordingly [vocational expert] assistance is advisable for these types of case."); Sousa v. Astrue, 783 F. Supp. 2d 226, 235 (D. Mass. 2011) (holding that vocational expert's testimony that a claimant can perform certain jobs qualifies as substantial evidence if the opinion of the vocational expert is "in response to a hypothetical that accurately describes the claimant's limitations.").

In his hypothetical to the vocational expert, the ALJ did not indicate that Spalke was capable of performing a full range of light work; rather, the ALJ placed several limitations, as reflected in his RFC, on the kind of light work Spalke could perform, including a limitation on the weight he could lift and the amount of time he could sit or stand. (Tr. 16, 78-79). Accordingly, I find that the ALJ did not err in finding that Spalke was capable of light work with limitations, as those limitations were correctly relayed to the vocational expert.

2.      Mental Health Limitations

Spalke argues the RFC is erroneous because it failed to reflect the full extent of his mental health limitations. (Docket #15 at 5-6). Specifically, Spalke contends that the ALJ failed to reflect his "moderate difficulties" with regard to "concentration, persistence or pace" in the RFC, suggesting it was error not to include a "more precise limitation." (Tr. 15; Docket #15 at 6).

In finding that Spalke was moderately limited with respect to concentration, persistence, or pace, the ALJ gave great weight to the assessments of Drs. Kiley and Kellmer. (Tr. 23). While Dr. Kiley found that Spalke's affective disorders and substance addiction disorders caused moderate difficulties in maintaining concentration, persistence, or pace, he nonetheless concluded that Spalke "remains able to focus on and complete simple, work related tasks." (Tr. 91, 96). On reconsideration, Dr. Kellmer affirmed Dr. Kiley's findings and agreed that Spalke could "manage simple work." (Tr. 116). While the ALJ did not expressly rely on it, the opinion of consultative examiner Dr. Haas also notes Spalke's problems with concentration. (Tr. 372). Despite this, Dr. Haas stated Spalke's "[a]ttention and concentration . . . were adequate" and that he was "capable of comprehending information, learning tasks of varying complexity, [and] learning new tasks with ordinary training." (Tr. 372, 375). He also stated that Spalke "appears to be capable of accommodating to routines and time constraints, following rules and directions, coping with novel or unexpected situations, and responding appropriately to the demands of others." (Tr. 376). Another consultative examiner, Dr. Bohnert, reported that Spalke had a "normal stream of mental activity" and that Spalke indicated he was able to watch television, prepare meals, shop for groceries, shower, do his own laundry and clean when necessary. (Tr. 295-96).

"When an acceptable medical source provides an opinion that despite moderate limitations in concentration, persistence, or pace the claimant is able to do unskilled work or simple routine work, no further restriction in residual functional capacity is necessary." Mudgett v. Colvin, No. 14-cv-143-JD, 2014 WL 6977869, at *3 (D.N.H. Dec. 9, 2014), (citing Falcon-Cartagena v. Comm'r of Soc. Sec., 21 F. App'x 11, 14 (1st Cir. 2001) (concluding that a moderate limitation in nonexertional functioning required for unskilled work does "not affect, more than marginally, the relevant occupational base")). While Drs. Kiley and Kellmer found that Spalke's ability to

maintain concentration, persistence, or pace was moderately limited, they concluded that this limitation did not preclude him from focusing on, and completing, simple work related tasks. (Tr. 96, 115-16). Similarly, Dr. Haas concluded that Spalke could comprehend information, accommodate routines and time constraints, and follow rules and directions. (Tr. 372, 376). The ALJ adequately accounted for the effects of Spalke's limitations with respect to concentration, persistence, or pace as opined by Dr. Kiley and Dr. Kellmer in the hypothetical he posed to the vocational expert, limiting Spalke to routine, repetitive tasks. (See Tr. 79). Hence, remand is not required.

      3.     Weight of Opinions and Incomplete Medical Record

Spalke's last objection to the ALJ's RFC is that it was based on the opinions of medical experts who did not take Spalke's complete medical record into account. (Docket #15 at 6-11). With respect to Spalke's severe physical impairments, the ALJ based his findings on the record as a whole and gave great weight to the opinions of state agency consultants Drs. Connelly and Holmes. (Tr. 23). Spalke argues that the opinions of Drs. Connelly and Holmes cannot constitute substantial evidence because there were additional medical findings after they completed their reviews, including imaging and other opinions, that "support additional severe impairments, including bilateral osteoarthritis of the hip, moderate to severe multilevel disc space loss in the lower cervical spine, and disc narrowing of the lumbar spine." (Docket #15 at 7). As a result, Spalke claims that the opinions of the state consultants are "incomplete and thus unreliable" and he accuses the ALJ of relying "on his lay interpretation of the evidence" of these conditions. (Docket #15 at 9-10). Spalke also includes an additional objection to the weight the ALJ assigned to the opinion of his treating physician, Dr. Wishik. (Docket #15 at 9). Spalke's arguments amount to an objection to the ALJ's finding at step two of the evaluation process, where the ALJ noted

Spalke had degenerative disc disease of the lumbar and cervical spine. (Tr. 14). Contrary to Spalke's objection, the record shows that the ALJ considered the additional conditions in making his determination such that it is based upon substantial evidence.

The mere diagnosis of an impairment "says nothing about the severity of the condition." See White v. Astrue, No. 10-10021-PBS, 2011 WL 736805, at *6, (D. Mass. Feb. 23, 2011) (quoting Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988)). The plaintiff bears the burden at step two of proving that he "suffers from a 'severe impairment' that 'significantly limits' [his] ability to perform basic work activities." Id. (quoting Bowen v. Yuckert, 482 U.S. 137, 141-42 (1987)). "Even if an error has been made at Step 2 by failing to find a particular impairment or combination of impairments to be severe, that error is harmless unless the plaintiff can demonstrate that inclusion of the impairment would have changed the outcome of the plaintiff's claim at Step 3, 4, or 5 of the sequential evaluation process." Treadwell v. Soc. Sec. Admin. Comm'r, No. 1:09-cv-00534-JAW, 2010 WL 4412311, at *2 (D. Me. Oct. 29, 2010); see Noel v. Astrue, No. 11-cv-30037-MAP, 2012 WL 2862141, at *6 (D. Mass. July 10, 2012) (noting that it is harmless error for an ALJ to omit a severe impairment provided the ALJ determined the plaintiff had at least one severe impairment and took all of plaintiff's impairments, severe and non-severe, into account when assessing his RFC) (citing 20 C.F.R. § 404.1545(a)(2)[21]).

As an initial matter, Spalke's argument that the ALJ should have found that he had severe impairments of multilevel disc space loss in the lower cervical spine and disc narrowing of the lumbar spine does not require remand. These more specific impairments are encompassed by the

---

[21] This citation is to the standards applied for Disability Insurance Benefits claims. The parallel citation for SSI claims is 20 C.F.R. § 416.945(a)(2).

ALJ's broader finding that Spalke had a severe impairment of degenerative disc disease of the lumbar and cervical spine.[22]  The ALJ appropriately accounted for these impairments.

Spalke asserts that the ALJ committed error requiring remand when he neither identified his bilateral osteoarthritis of the hips as a severe impairment nor explained why it was not a severe impairment.  (Docket #20 at 1).  Spalke was diagnosed with bilateral hip osteoarthritis on February 16, 2014, following x-rays of his pelvis and left hip which demonstrated mild joint space narrowing and marginal spurring in his left hip.  (Tr. 810).  An x-ray taken on July 9, 2014, after a fall, showed moderately severe arthritic changes at the left hip and mild arthritic changes at the right hip.  (Tr. 709).  The ALJ explicitly acknowledged Spalke's treatment for hip pain after this fall in his opinion as well as the fact that, upon examination, he was able to ambulate with some difficulty.  (Tr. 22). After the fall, Spalke was given crutches to reduce weight-bearing on his left hip which he was directed to use until follow-up or his symptoms improved.  (Id.).  At the hearing before the ALJ, Spalke testified that his hip had become a problem in January 2014, and that the pain was all in his left hip.  (Tr. 68, 72).

Spalke has failed to demonstrate that the inclusion of a severe impairment of bilateral osteoarthritis of the hips would have changed the outcome of his claim.  At the hearing, Spalke testified that he could stand for only ten or fifteen minutes and sit for fifteen to twenty minutes. (Tr. 59-61).  Spalke stated that he had been so restricted since at least 2011, years prior to his diagnosis of bilateral osteoarthritis of the hips.  (Id.).  While Spalke was given crutches following his fall on July 10, 2014 to reduce weight-bearing on the left hip (Tr. 711), when Spalke returned to the hospital on August 2, 2014 complaining of low back pain after falling on stairs, there was no indication that Spalke was using crutches at that time.  (Tr. 699-702).  In fact, Spalke indicated

---

[22] Spalke appears to recognize this in his reply brief in which the only claim of harmless error that he makes with respect to step two of the sequential process relates to his alleged hip impairment.  (See Docket #20 at 1-4).

that he was running when he fell. (Tr. 701-02). Nor is there any indication that Spalke was using crutches at the hearing before the ALJ. (Tr. 33-84). Although the diagnosis of bilateral osteoarthritis of the hip and the x-rays demonstrating this condition post-date the opinions rendered by Drs. Connelly and Holmes, there is no evidence that this condition affected Spalke's abilities to any greater degree than his other impairments. Because Spalke has failed to demonstrate that the inclusion of this impairment would have changed the outcome of the sequential evaluation process, remand is not required. See Treadwell, 2010 WL 4412311, at *2.

As for Spalke's objection to the weight assigned to Dr. Wishik's opinion, the ALJ properly discounted his findings. A treating physician's opinion as to the nature and severity of a claimant's impairments is entitled to controlling weight if it is consistent with "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). However, "[w]hen a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of 'controlling weight' does not apply." Shaw v. Sec'y of Health & Human Servs., No. 93-2173, 1994 U.S. App. LEXIS 14287, at *11-12 (1st Cir. June 9, 1994); see Leahy v. Raytheon Co., 315 F.3d 11, 21 (1st Cir. 2002) ("When other evidence sufficiently contradicts the view of a treating physician, that view appropriately may be rejected."). When an ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must consider the following factors to determine what weight to actually give the opinion: the length, nature, and extent of treatment and the frequency of the examination; supportability of the opinion by the evidence; consistency with the record; the specialization of the treating source; and any other relevant factors which support or contradict the opinion. 20 C.F.R. § 416.927(c)(2)-(6); see Rodriguez Pagan, 819 F.2d at 3 (holding that ALJ was not required to assign treating physicians' opinions controlling weight because the opinions were

based excessively on claimant's subjective complaints, rather than on objective medical findings). The ALJ need not discuss each individual factor. Healy v. Colvin, No. 12-30205-DJC, 2014 U.S. Dist. LEXIS 40940, at *41 (D. Mass. Mar. 27, 2014). If the ALJ affords less weight to a treating physician's opinion after considering these factors, the court must uphold the decision so long as the ALJ's decision and reasoning are sufficiently clear. Green v. Astrue, 588 F. Supp. 2d 147, 155 (D. Mass. 2008).

Here, the ALJ gave Dr. Wishik's opinion "less weight" because the proffered limitations "are not consistent with the medical record as a whole" and "are inconsistent with [Spalke's] reported activities of daily living." (Tr. 23). This decision is supported by substantial evidence as the record is replete with references to Spalke's ability to shop and attend meetings (Tr. 221), clean and do laundry "in short spirts" (Tr. 246), and watch television and prepare meals (Tr. 295-96). As such, the weight afforded to Dr. Wishik's opinion also does not require remand.

B.      The ALJ's Step Four Finding

Next, Spalke argues the ALJ's step four finding that he could perform past relevant work as a receptionist was flawed. (Docket #15 at 11-14). Spalke claims that the ALJ erred here because his finding was based upon the vocational expert's testimony in response to a hypothetical that did not reflect Spalke's additional impairments. (Docket #15 at 11-12). As previously explained, the ALJ's RFC is supported by substantial evidence.

Spalke also argues that his past work as a receptionist does not qualify as past relevant work. (Docket #15 at 12-14). Past relevant work is work that was performed within the last fifteen years, lasted long enough for the individual to learn how to perform it, and was substantial gainful activity. 20 C.F.R. § 416.965(a). Substantial gainful activity is work activity that is both substantial and gainful, defined in 20 C.F.R. § 416.972 as follows:

(a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

If an individual can perform past relevant work, he is not disabled. <u>Goodermote</u>, 690 F.2d 5 at 7; 20 C.F.R. § 416.971. Here, the ALJ determined that Spalke was capable of performing past relevant work as a receptionist based on his work at Two Brother's Construction where he answered the phone, worked the fax machine and filed papers.[24] (Tr. 25, 40-41, 75).

In his Adult Disability Report, Spalke indicated he worked at Two Brother's Construction for two years, from January 2009 to January 2011, earning $250.00 per week. (Tr. 203). However, at the hearing, Spalke testified that he worked for the company for only eight months. (Tr. 40). This discrepancy is immaterial. The listed receptionist position has a SVP of 3 which requires between one and three months to learn. <u>Dictionary of Occupational Titles</u> (U.S. Dep't of Labor, 4th ed. Rev. 1991); <u>see</u> <u>Proctor v. Barnhart</u>, No. 05-181-B-W, 2006 WL 2827662, at *3 (D. Me. Sept. 29, 2006) (outlining the SVP requirements for an occupation with an SVP level of 3). Therefore, regardless of whether Spalke worked for Two Brother's Construction for eight months or two years, he was at the job long enough to learn how to perform the position.

In addition to meeting the durational requirement, Spalke's work as a reception also qualified as substantial gainful activity. An individual's earnings are used to determine whether they have done substantial gainful activity. 20 C.F.R. § 416.974(a)(1). During the period that

---

[24] The ALJ listed the Receptionist position as #352.667-010 in the Dictionary of Occupational Titles. That record is titled "Host/Hostess" but lists "Receptionist" as a viable alternate title. The SVP is 3, defined as requiring over one month and up to and including three months to learn. <u>Dictionary of Occupational Titles</u> (U.S. Dep't of Labor, 4th ed. Rev. 1991). There is also a separate Dictionary of Occupational Titles entry for "Receptionist," #237.367-038 with a SVP of 4, requiring between three and six months to learn. <u>Id.</u>

Spalke worked for Two Brother's Construction, i.e. between 2009 and 2011, monthly substantial gainful activity amounts ranged from $980 to $1000. <u>See</u> Social Security Administration, Substantial Gainful Activity, https://www.ssa.gov/oact/cola/sga.html. Spalke's reported earnings, totaling $1000 per month, qualify as substantial gainful activity. Thus, because his work at Two Brother's Construction was performed within the last fifteen years, lasted long enough for Spalke to learn how to perform it, and was substantial gainful activity, the ALJ supportably determined that Spalke could perform past relevant work and was therefore not disabled.

However, even if the ALJ erred in finding Spalke's work as a receptionist qualified as past relevant work, that error would be harmless because the ALJ provided an alternative finding at step five that there were other jobs in the national economy Spalke could perform. <u>Otero v. Colvin</u>, No. 14-cv-206-PB, 2015 WL 5089810, at *6 (D.N.H. Aug. 27, 2015) ("Because substantial evidence supports the ALJ's step five determination that Otero is not disabled, Otero's objection to the ALJ's antecedent step four determination is material only if the ALJ committed reversible legal error by making alternative findings at step four and step five.").

C.     The ALJ's Step Five Finding

Lastly, Spalke contests the ALJ's step five finding that he could perform work in the economy as a surveillance system monitor, telephone solicitor, and document preparer. (Docket #15 at 14).

Spalke first argues these occupations are inconsistent with his moderate limitations in concentration, persistence, or pace because they require a general educational development ("GED") reasoning level of three.[26] (Docket #15 at 14). There is a split of authority on the issue

---

[26] The Dictionary of Occupational Titles outlines six GED reasoning levels, ranging from level one, which requires a person to"[a]pply commonsense understanding to carry out simple one- or two-step instructions" and to "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job[,]" to level six, which requires a person to "[a]pply principles of logical or scientific thinking to a wide range of intellectual and

of whether a GED reasoning level of three comports with a limitation to simple work. Compare Hurtado v. Comm'r of Soc. Sec. Admin., 425 Fed. App'x 793, 794-95 (11th Cir. 2011) (limitation to simple, routine work not inconsistent with GED reasoning levels of two or three) (per curiam); Morris v. Comm'r Soc. Sec. Admin., 421 Fed. App'x 693, 694 (9th Cir. 2011) (VE reasonably testified that a job with a complexity level of three out of six does not present complex tasks of the type the plaintiff could not do); Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009) (limitation to simple work did not conflict with GED reasoning level of three); and Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007) (limitation against complex work did not conflict with GED reasoning level of three) with Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005) (stating that a limitation to "simple and routine works tasks . . . seems inconsistent with the demands of level-three reasoning"); and Meissl v. Barnhart, 403 F. Supp. 2d 981, 984-85 (C.D. Cal. 2005) (suggesting that the dividing line between simple and more complex jobs is at reasoning level two).

Although the First Circuit has not yet decided this issue, "[t]he majority of federal districts . . . have followed the Seventh and Eighth Circuits" in holding "that no conflict exists between the VE's testimony that Plaintiff could work [at a position with a GED level of three] despite being limited to 'simple and unskilled' work, and the [Dictionary of Occupational Title's] level-three classification." Auger v. Astrue, 792 F. Supp. 2d 92, 96-97 (D. Mass. 2011) (citing cases). Moreover, nothing in Plaintiff's medical record suggests that he would be unable to

---

practical problems" and to "[d]eal with nonverbal symbolism (formulas, scientific equations, graphs, musical notes, etc.) in its most difficult phases." Dictionary of Occupational Titles Appendix C, § III (U.S. Dep't of Labor, 4th ed. Rev. 1991). A job with a GED reasoning level of three requires a person to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and to "[d]eal with problems involving several concrete variables in or from standardized situations." Id

"[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form," as required by the position.

Spalke also reiterates his argument that the ALJ's RFC was erroneous, contending that the evidence in fact compels a finding of disability according to the Social Security Administration's regulations. (Docket #15 at 15) ("The fundamental problem is that, pursuant to the Commissioner's regulations, Mr. Spalke must be found disabled because he was limited to only sedentary work."). This point revisits his previous argument that the ALJ's RFC was erroneous. Spalke believes the evidence compels a finding of disability, pointing out that the Social Security "Grid" rules deem an individual to be disabled when they are approaching advanced age, limited to unskilled or semi-skilled work at the sedentary exertional level, and have no transferable skills. See Grid Rule 201.14, 20 C.F.R. Part 404, Subpart P, Appendix 2[27]; (Docket #15 at 15). Indeed, according to the Grid rules, an individual with the aforementioned characteristics is deemed to be disabled. Such characteristics, however, are not present in the RFC the ALJ assigned to Spalke, which, as explained previously, is supported by substantial evidence. Hence, the ALJ's step five finding does not warrant remand.

---

[27] Incorporated into SSI determinations via 20 C.F.R. § 416.969.

## IV.  CONCLUSION

For the foregoing reasons, I hereby RECOMMEND that Spalke's Motion for Order Reversing the Decision of the Commissioner (Docket #15) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #16) be ALLOWED. [28]


/S/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[28] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).